# Lewis *against* Robinson.

If unseated land belonging to two tenants in common be sold for taxes, and after the time for redemption, one of them buy it from the purchaser at the tax sale, in his own name, and for his own use, the other is entitled to no interest in such purchase. Nor will the fact of indebtedness by the purchaser of the tax-sale title, to him who was his co-tenant, to an amount equal to the one-half of the purchase-money, alter the nature of the case.

Nor will the circumstances of the father of the co-tenant who bought of the purchaser of the tax-sale title, having been first guardian of, and then co-tenant with the other in the land, and having from the commencement of his guardianship to the time of his death, paid the taxes out of money of the ward in his hands, raise any obligation upon his son, who succeeded to his right in the land, and thus become co-tenant in his father's place, to continue the payment of taxes.

ERROR to the district court of *Allegheny* county.

This was an action of ejectment by Samuel Lewis against William Robinson, Jun., and J. Forsyth, to recover the undivided moiety of a lot of ground in the town of Allegheny, according to the general plan thereof. Both parties derived their respective claims to the lot from William Braden, who obtained a patent for it from the commonwealth dated the 2d of September 1790. Shortly after this date, most likely in the same year, Braden died seised of this and other lots of ground situate in and adjacent to the town of Allegheny, leaving three children, one son and two daughters. The son, whose name was John, according to the law of descent

in force at that time, became thereby invested with the title to an undivided moiety; and his sisters, whose names were Mary and Margaret, become each entitled to an undivided fourth part thereof. The plaintiff claimed under a deed from John and his wife, dated the 1st of February 1839, whereby they, in consideration of 400 dollars, received from the plaintiff, conveyed to him and his heirs "all his (the said John's) claims as one of the heirs of William Braden." In 1798 Mary Braden conveyed all her interest in her father's estate to Robert Buntin, who in December 1806 with his wife conveyed the same to George Wallace and James Robinson, the father of William Robinson, one of the defendants. In February 1805, Margaret, the other daughter of William Braden, in conjunction with her husband William Wyatt, in consideration of 300 dollars received of William Porter, conveyed to him and his heirs all the interest which the said Margaret had in her late father's estate. Porter afterwards, in March 1806, conveyed the one-half of what he acquired from Margaret Wyatt and her husband to Alexander M'Laughlin; who in February 1810, in his own right, and as executor of Porter, conveyed all the interest and estate which he acquired from Margaret and her husband to George Wallace and James Robinson, for the consideration of 1434 dollars, 34 cents received of them. John Braden and Margaret his sister were minors when their father died; and on the 1st of December 1794, James Robinson, the father of the defendant, William Robinson, was appointed their guardian by the orphan's court of Allegheny county. James Robinson died in 1814, leaving William Robinson, the defendant, his only child and heir at law; and the latter as such became thereupon entitled to his father's estate. The lot in question was unseated in the years 1814, 1815, 1816, 1817 and 1818, and assessed with taxes as unseated land. The assessment of the first three years, states the name of the owner to be unknown, but it is assessed in the name of William Braden for the last two. In 1818, the taxes of each of those years remaining unpaid, the lot was regularly sold, on account thereof, to Alexander Lukey; who received from the treasurer of Allegheny county a deed dated July 20, 1818, perfecting the sale; and by his endorsement thereon, dated the 16th of December 1836, assigned the same to William Robinson the defendant, in consideration of 1300 dollars received of him. The defendants thus claim to hold the possession of the lot, under the sale made thereof for the taxes assessed thereon, and remaining unpaid. The counsel for the plaintiff, after the defendants had given the proper evidence of their title to the lot, offered by way of rebutting evidence, as it was said, to prove that during the lifetime of James Robinson, he paid all the taxes which were assessed on the lot; first, by showing the assessments, and, secondly, the payment thereof by the said James Robinson; and likewise that said Robinson in his lifetime spoke of his having the lot and paying the taxes upon it for the benefit of his wards; and

[Lewis v. Robinson.]

further, that he had moneys in his hands at the time of his death, belonging to them, which might have been applied by William Robinson the defendant, who succeeded to all his father's rights, to the discharge of the taxes for which the lot was sold. The court below however, rejected all this evidence; and the plaintiff's counsel excepted to the opinion of the court in this respect. The plaintiff's counsel then farther offered to prove that lot No. 41, lying in the town, or among the out-lots to the town of Allegheny, was held in common by John Braden and the late James Robinson, and subsequently by the said Braden and William Robinson the defendant, that the rents of the said property were received by the said James Robinson, and subsequently by the said William Robinson; that after the death of James Robinson, William Robinson made sales to a large amount of the common property, professing to convey the fee simple to the whole; which sales the plaintiff ratifies and confirms; and that the moneys derived by the said William Robinson from these sales were in his hands at the time of his alleged purchase of the tax title from William Lukey. The court below also rejected this evidence, and the counsel for the plaintiff excepted to the opinion of the court on this point.

The court below (Dallas, president) in their charge to the jury, among other things, told them, that as far as it could discover from the testimony, William Robinson was not, in point of law, bound, nor was he under any moral obligation to pay the taxes upon the property in question. The responsibilities and trust of his father did not descend upon him. And in a subsequent part of the charge the court further instructed the jury that "the rule of law which prevents one tenant in common from turning his co-tenant out of possession by availing himself of the advantage of another and better title, is founded upon considerations involving the unfairness and fraud of such a course; and if in the present case there be any testimony warranting the imputation of fraud, or contrivance on the part of William Robinson, Jun., in obtaining the title from William Lukey, he cannot be permitted to avail himself of the benefit of such title against his co-tenant; and he would be regarded as a trustee for the person to whom, by his previous relation, he was bound to a course of honesty and fair dealing."

The counsel for the plaintiff also excepted to the charge of the court, and have assigned for error the exceptions taken to the opinion of the court rejecting the evidence mentioned above; and that the court erred also in saying to the jury that responsibilities and trusts of the defendant's father did not descend upon the son; and in holding that actual fraud was necessary to bring into exercise the equitable principles that govern a tenancy in common.

*Biddle* and *M'Candless,* for plaintiff in error, cited 24 *Law Lib.* 104; *Lew. on Trustees* 205; 5 *Paige's Chan. Rep.* 569; 7 *Watts* 472; 2 *Whart.* 63; 7 *Watts* 389. 415; 2 *Story's Eq.* 508; *Lew. on*

*Trustees* 106; 4 *Burr.* 1985; 3 *Watts* 277; 3 *Serg. & Rawle* 513; *Select Ca. in Chan.* 62; *Willes on Trustees* 24, *et seq.*; 10 *Law Lib.* 24, 25. 29. 32, 33; 1 *Bro. Chan. Ca.* 81; 4 *Littell* 187; *Fonb. Eq.* 423; 5 *Johns.* 388. 407.

*Forward* and *Dunlop,* for defendants in error, cited 24 *Eng. Com. Law Rep.* 448; *S. C.* 5 *Carr. & Payne* 542; 18 *Wes.* 517; 1 *Vern.* 144; 2 *P. Wms.* 681; 5 *Paige's Chan. Rep.* 571; 12 *Serg. & Rawle* 377; 2 *Yeates* 307.

The opinion of the court was delivered by

KENNEDY, J.—Unless the evidence mentioned in the bills of exceptions tended to prove something that would either, in law or equity, have made the defendant, William Robinson, a trustee as to a moiety, or some other part of the lot at least, for the benefit of the plaintiff or his assignor, John Braden, there is no ground whatever upon which it could, with propriety, have been received. But there is no pretence for saying that it tended, in the slightest degree, to prove a trust created by the agreement of the parties. Its tendency, at most, was only to prove that James Robinson, the father of the defendant, being the guardian of John Braden, until he attained full age, paid the taxes assessed on the lot in question probably as such, while he was guardian; and that afterwards having become part owner of it, as it appeared from the evidence adduced by the plaintiff himself, might have paid them on account of his interest therein out of his own moneys. For it was not offered to show that, during the time he paid the taxes, he had in his hands any moneys belonging to John Braden, out of which he might have paid them; nor do I consider that this would have materially altered the case, if such proof had been offered. The offer, however, was to prove, in the first place, that James Robinson at the time of his death had moneys of John Braden in his possession, or in other words, that he was indebted to Braden for moneys received for the use of the latter, which must have come into the hands of the defendant, who succeeded to all the rights of his father. But admitting that, from the evidence thus offered, the jury might have inferred an agreement made by James Robinson in his lifetime with John Braden, to pay the taxes assessed upon the lot, there is still no colour for saying that such an agreement was to endure beyond the will and pleasure of the parties, much less beyond the life of either. It could not after the death of James Robinson, impose any obligation of an executory nature upon either his real or personal representatives; consequently upon the death of James Robinson, Braden had no reason to confide in William Robinson's paying the taxes upon the lot as his father had done in his lifetime. It was then the duty of Braden to have attended to it himself if he wished it done, or if inconvenient for himself to do so, to have employed some one to do it for him;

X.—2 F

and in case of his neglect to do this, the loss that might accrue therefrom was most unquestionably to be his own. If James Robinson were indebted, or had moneys in his hands belonging to John Braden at the time of his death, his estate was bound for the payment of it, and to this source Braden ought, in due time, to have looked for payment. And had the indebtedness existed, the probability is very strong that he would have done so. But it is entirely out of all reason to hold that William Robinson on that ground could be made responsible for any loss that might accrue to Braden or his assignee by reason of not paying the taxes assessed on the lot. And even had William Robinson, without the consent of Braden, applied the money, owing by his father, in that way until he had paid taxes exceeding in amount the actual value of the lot, Braden might have abandoned all claim to the lot, and what remedy would the defendant then have had for the money so paid? I doubt very much whether he could in a suit brought by Braden against his father's estate to recover the debt coming from it, have been allowed to defalcate or set it off. It may perhaps be thought that this could not possibly have occurred. But although it may be true that in this case, on account of the great increase in the value of the lot, from lapse of time and other causes, it could not have happened, yet it is certainly true, that in hundreds of other instances, the aggregate of the taxes assessed upon unseated lands within the state, for a series of years has exceeded their real value, and there have been instances in which the owners thereof have declined paying the taxes for this reason. And for this reason also, it frequently happens that the commissioners of counties have to buy such lands at sales made thereof for taxes in arrear upon them; because nobody is willing to take them and pay the taxes that may be assessed upon them annually. The lot in question does not appear to have been of much value originally, for down as late as 1816 it was only valued at 50 dollars in the assessment. Neither did the other evidence offered and rejected go to show that William Robinson had ever agreed, or come under any obligation to John Braden, to pay the taxes for which the lot was sold, or that he, on account of moneys in his hands belonging, or owing by him to, John Braden, ever agreed to purchase the lot afterwards from Leckey, in trust, either in whole or in part for the use of Braden. The fact supposing it to be so, which is the utmost that the evidence offered in the second place tended to prove, that William Robinson had sold lot No. 41, which Braden claimed to have an interest in, and that he had received thereon a large amount of money, it was not proposed to be proved that it had any connection with the title to the lot in question, or the purchase of it from Leckey, so as to give Braden an interest in it. And without something of this sort, it would only show that William Robinson, at the time he bought the lot of Leckey, was indebted to Braden in a sum of money equal, say at least to half of the purchase-money

But surely it was never held that the purchase of real estate by a debtor in his own name, and professedly for his own use, created a trust therein in favour of his creditor, so as to entitle the latter either in a court of law or equity to claim and recover the estate. But besides, it would be a sufficient objection to the admission of such evidence, that it would necessarily give rise to the trial of several collateral issues, of which the defendant could not be supposed to have any previous notice; and therefore could not be prepared to meet the plaintiff on them; this might, and most probably would produce great injustice. For instance, had the evidence offered been received, it would have raised the question whether John Braden had any right or interest in lot No. 41, or Robinson the defendant was not the sole owner, when he as such sold it; and if it should have appeared from the evidence that he was not, and that Braden had an interest in it, then a statement of an account showing the moneys disbursed and received by the defendant on account of the lot must have been gone into, settled and adjusted between the parties. But it is evident this could not all have been effected so as to have done justice, without previous notice given to the defendant that he might have come to the trial prepared to meet the plaintiff on all these issues. We therefore conceive that the court below was clearly right in rejecting the evidence offered.

We are also of opinion that the exceptions taken to the charge of the court have not been sustained. The court in saying to the jury that "the responsibilities and trust of his father did not descend upon the son," (the defendant,) plainly meant, that if there were any responsibility or trust created on the part of the father, it could not from any thing that appeared in the cause be considered 'more than personal, and therefore that it died with him. If there were any trust or responsibility resting on the father to pay the taxes assessed on lot No. 119, it was of this nature; for there is not the slightest ground for raising a responsibility or trust of the sort connected with the title to the lot, which could have descended therewith upon the son. Neither are we prepared to decide that the court erred in what it said to the jury, as to one tenant in common buying in an outstanding and better title, with a view to turn the other out of possession and become himself the sole owner of the estate. But such was not the relationship between John Braden and William Robinson when the latter bought the lot of Leckey. Neither Braden nor Robinson had the least colour of claim to it then. The sale made of it some eighteen years before that, divested them completely of all their right to it after the expiration of two years from the date of the sale. Had either of them redeemed the lot as provided by the act of assembly, within the two years, such redemption would doubtless have enured to the benefit of both, because it would have been a defeasance of Leckey's purchase, and have placed Braden and Robinson in the same position that they stood, in regard to the ownership of the lot, at and im-

mediately before the sale thereof. Neither, however, having re-
deemed the lot within the two years, the purchase of it by Robin-
son from Leckey must be regarded in the same light as if it had
been effected by any third person, or as if Robinson had never had
any interest or right in it whatever before.

Judgment affirmed.